**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| CES Environmental Services, Inc., | |
|     *Plaintiff,* | |
| v. | |
| The City of Houston; and | Cause No. 2009–_____ |
| |     Jury Demanded |
| Michael S. Marcotte, Director, Department of Public Works and Engineering, City of Houston, in his official capacity, | |
|     *Defendants*. | |

K.A.D. Camara
Texas Bar No. 24062646
Southern District Bar No. 870498
camara@camarasibley.com

    *Attorney-in-Charge for the Plaintiff*

Joe Sibley
Texas Bar No. 24047203
sibley@camarasibley.com
Kent Radford
Texas Bar No. 24027640
radford@camarasibley.com

Camara & Sibley LLP
2339 University Boulevard
Houston, Texas  77005
713-893-7973
713-583-1131 (fax)

    *Attorneys for the Plaintiff*

**TABLE OF CONTENTS**

I.   THE IMMEDIATE NEED FOR A TEMPORARY RESTRAINING ORDER......................... 1

   A.   On Saturday, October 31, 2009, the City of Houston shut down CES's
        consolidated waste treatment facility at 4904 Griggs Road without any notice
        and without a pre-shutdown hearing. .............................................................................. 1

   B.   The municipal ordinances under which the City acted permit a shutdown
        without notice only when there is an "immediate danger to the health of city
        employees or the public." ....................................................................................................... 4

   C.   On Wednesday, November 4, 2009, the City held a hearing at which it
        defended Mr. Marcotte's findings of "immediate danger" in front of a Hearing
        Officer who was a non-lawyer city employee, who reports to Mr. Marcotte,
        and who was advised at the hearing by City Attorneys who, during the
        hearing, consulted with the City Attorneys arguing the City's case. ..................... 7

   D.   The City's only witness, Walid Z. Samarneh, testified that there was no
        imminent danger of harm to city employees or the public to justify the City's
        emergency termination of CES's wastewater service. ...............................................11

   E.   The City's lawless termination of wastewater service is destroying CES's
        business..........................................................................................................................................15

II.   PARTIES.........................................................................................................................................17

III.   JURISDICTION AND VENUE...............................................................................................18

IV.   THE CITY REFUSED TO HEAR CES'S DUE PROCESS CLAIM AT THE
      ADMINISTRATIVE HEARING, SO THERE IS NO ONGOING STATE PROCEEDING
      IN WHICH CES CAN RAISE ITS CONSTITUTIONAL ARGUMENTS...........................19

V.   CAUSE OF ACTION — 42 U.S.C. § 1983 .................................................................23

   A.   Elements ........................................................................................................................................23

   B.   CES had a property interest in its right to discharge wastewater under its
        permits from and contract with the City of Houston. .................................................24

   C.   The City deprived CES of its right to discharge wastewater without due
        process of law. ............................................................................................................................26

   D.   The defendants are state actors who acted under color of municipal law in
        denying CES due process of law. ........................................................................................28

VI.    TEMPORARY RESTRAINING ORDER .................................................................30

VII.   PRAYER FOR RELIEF ........................................................................................33

**TABLE OF EXHIBITS**

Exhibit A          Letter from Clyde Smith to CES re: Termination of Wastewater Service to CES (Saturday, October 31, 2009)

Exhibit B          Letter from Camara & Sibley LLP to CES Requesting a Hearing re: Termination of Wastewater Service to CES (Monday, November 2, 2009)

Exhibit C          Letter from Assistant City Attorney Ceil Price to Camara & Sibley LLP Confirming Hearing Schedule and Attaching Description of Hearing Procedure (Tuesday, November 3, 2009)

Exhibit D          Transcript of the Administrative Hearing re: Termination of Wastewater Service to CES, including Examination of Walid Z. Samarneh of the City of Houston's Wastewater Division (Wednesday, November 4, 2009)

Exhibit E          Declaration of Clinton Hopkins, CES Director of Processing

Exhibit F          Declaration of Miles Root, CES Laboratory and Quality Assurance Manager

Exhibit G          Declaration of Prabhakar Thangudu, CES Health, Safety, and Environment Manager

Exhibit H          Declaration of Mark Atkins, Texas Water Management (a CES customer)

Exhibit I          City of Houston Code of Ordinances, Chapter 47, Article 5 (Disposal of Industrial Wastes Through City Sewer System)

Exhibit J          Permit No. 6806 for Discharge at Sample Point (1)

Exhibit K          Permit No. 9558 for Discharge at Sample Point (5)

Exhibit L          Memorandum to File Containing Mr. Marcotte's Findings

Exhibit M          Letters Regarding Sealing Sample Point (1)

Exhibit N          Letters Regarding Alleged Categorical Discharge Limit Violations

Exhibit O          Letters Regarding Alleged TTO Discharge Limit Violations

Exhibit P          Letters Regarding Repairs to Sampling Point at Sample Point (5)

Exhibit Q          EPA Model Pretreatment Ordinance

Exhibit R          Declaration of Greg Bowman, CES Vice President of Finance

## ORIGINAL COMPLAINT

COMES NOW CES Environmental Services, Inc., and complains that the City of Houston has deprived it of its vested rights to wastewater service without notice or hearing in violation of 42 U.S.C. § 1983 and the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

## I.     THE IMMEDIATE NEED FOR A TEMPORARY RESTRAINING ORDER

**A.     On Saturday, October 31, 2009, the City of Houston shut down CES's consolidated waste treatment facility at 4904 Griggs Road without any notice and without a pre-shutdown hearing.**

1.      On Saturday, October 31, 2009, the City of Houston shut down wastewater service at the CES consolidated wastewater treatment facility located at 4904 Griggs Road.  *See* Ex. A (Letter re: Shutdown); Ex. E (Declaration of Clinton Hopkins). This action exceeded the City's power under its own municipal ordinances because there was neither an "immediate danger to the health of city employees or the public" nor any "likelihood that the city's treatment plant permit parameters (including sludge) [would] be violated."  City of Houston Code of Ordinances § 47–208(f).[1]

2.      This action also violated CES's rights under the Due Process Clause and 42 U.S.C. § 1983.  Through the shutdown, the City deprived CES of its property right in the wastewater service that CES needs to run its business.  The City created this property right by issuing CES the permits that allow CES to discharge wastewater into the City's sewers.  It was unconstitutional for the City to deprive CES of this right without affording CES due process of law, including reasonable notice of the shutdown and a pre-shutdown hearing at which CES could challenge the City's reasons for shutting down service.

---

[1] A copy of the relevant ordinances is attached as Exhibit I.

3.      CES received no notice of the City's shutdown until it happened.  For two weeks before the shutdown, CES had been trying to arrange phone calls or meetings with the City to discuss the City's wastewater concerns, all to no avail.  At 11:00 a.m. on Saturday, city vans with a police escort arrived at the Griggs Road facility to begin the shutdown.  With them were Clyde Smith and Walid Samarneh, two employees of the Industrial Wastewater Service of the Department of Public Works and Engineering.  Mr. Smith and Mr. Samarneh delivered a letter to Steve Stricker, an employee and part owner of CES.  Meanwhile, the security officer on duty called Clint Hopkins, CES's director of processing, who left home and headed for the plant immediately.

4.      The October 31 termination letter stated that the City was terminating CES's service because of its failure to seal "sample well number one which is listed on Industrial Waste Permit No. 6806."  Ex. A at 1.  The letter also stated that Michael S. Marcotte, the Director of Public Works and Engineering, had made the necessary findings of immediate danger to justify a shutdown without notice under Code of Ordinances § 47–208(f).  In relevant part, the letter reads:

> **The City of Houston**'s Industrial Wastewater Service of the Department of Public Works and Engineering **issued letters dated October 5th and 13th, 2009, to CES Environmental Services, Inc. (CES) requesting CES to seal sample well number one** which is listed on Industrial Waste Permit No. 6806.  On October 28, 2009, the Industrial Wastewater service performed a site visit at CES and it was determined that no action had been taken to comply with the requirement to seal the sample well.  In addition, as of the required compliance date of October 30, 2009, the referenced sample well has not been sealed.
>
> **The City has determined that your failure to comply with our October 5th and 13th letters constitutes a material breach of Industrial Waste Permit Numbers 6806 and 9558.**  Further, **the Director of Public Works has made a determination that a discharge from your facility causes an immediate danger to the health of city employees or the public or a likelihood that the city's treatment plant permit parameters will be violated.**  You are hereby notified that your

2

> wastewater service will be discontinued on the above referenced date for
> failure to comply with the City's Wastewater Pretreatment Program.

Ex. A at 1 (emphasis added).  The "above referenced date" for termination of service is:

"Reference Termination Date:  IMMEDIATE Termination of Wastewater Service."  *Id.*

5.      The October 31 letter instructed CES "that the department may provide a hearing within three days of this termination," but only if CES "submit[s] a written request to the Industrial Wastewater Service requesting a hearing to show cause why sewer service should be restored."  *Id.*  On Monday, November 2, 2009, CES sent a letter to Mr. Smith requesting a hearing pursuant to § 47–208(f).  *See* Ex. B.  CES objected to the suggestion in the City's letter that the burden of proof at this hearing would be on CES rather than the City, requested a copy of any procedures to be followed at the hearing, and requested that the City specify the reasons underlying Mr. Marcotte's conclusion that continuing CES's wastewater service would pose an "immediate danger."  *Id.* at 1–2.

6.      CES and the City agreed by phone that the hearing would take place on Wednesday, November 4, at 2:00 p.m. in the City Hall Annex.  On Tuesday, November 3, 2009, Ms. Ceil Price, a Senior Assistant City Attorney, sent a letter to CES confirming the Wednesday hearing; informing CES that Mr. Marcotte had appointed Ebrahim Nassiri, a city employee in the Engineering and Construction Division (a division that also reports to Mr. Marcotte) as the "neutral and impartial city representative" and "Hearing Officer"; and claiming that the burden of proof would be on CES at the hearing to refute Mr. Marcotte's findings of "immediate danger."  Ex. C at 1.

3

**B.     The municipal ordinances under which the City acted permit a shutdown without notice only when there is an "immediate danger to the health of city employees or the public."**

7.     The Code of Ordinances affords three different levels of procedural protection to a wastewater-service customer depending on the City's reason for terminating wastewater service.  The relevant rules appear in § 47–208(a) and (f), which provide:

> (a)     **Except as provided herein for discharges posing immediate danger, the utility official shall give ten days' prior notice to any person whose utilities are to be terminated pursuant to the provisions of this article.** Any such notice shall specify the reasons for the proposed termination and inform the affected person of the appeal procedure provided herein. If, within said ten-day period, the utility official receives notice that such person requests a hearing, the effective date of termination shall be automatically delayed at least until the date set by the utility official for a hearing. The utility official shall select a hearing date, giving the person appealing the decision at least three days notice thereof.
>
> * * *
>
> (f)     If the director determines that a discharge from an industrial user causes:
>
> > (1)     An immediate danger to the health of city employees or the public; or
> >
> > (2)     A likelihood that the city's treatment plant permit parameters (including sludge) will be violated,
>
> then the department may, after prior notice, immediately terminate water/wastewater service and provide a hearing as described herein within three days of initial termination.

Code of Ordinances § 47–208(a), (f) (emphasis added).

8.     The reasons for which the City may terminate service include the two listed in § 47–208(f), but also include many other ordinary reasons, including, for example, violations of the customer's own permit.  *See id.* § 47–190(a).  Which kind of

reason the City relies on determines the notice and hearing that the City must give under

§ 47–208(a) and (f):

- *Notice.*  If there is "an immediate danger to the health of city employees or the public," then the department need only give some "prior notice," after which it may "immediately terminate water/wastewater service," so long as it provides a post-deprivation hearing "within three days of initial termination."  Code of Ordinances § 47–208(f).  In all other cases, that is, when there is not an immediate danger, the City must give at least 10 days' prior notice before terminating service.  *See* Code of Ordinances § 47–208(a) ("Except as provided herein for discharges posing immediate danger, the utility official shall give ten days' prior notice").

- *Hearing.*  If either condition in § 47–208(f) is met (either immediate danger or "[a] likelihood that the city's treatment plant permit parameters (including sludge) will be violated"), then the City may terminate wastewater service "immediately" after giving the required notice.  Under § 47–208(a), the required notice is simply "prior notice" if the City acts under § 47–208(f)(1) (immediate danger) and at least 10 days if the City acts under § 47–208(f)(2) (risk of City violating its own permit).  If neither condition in § 47–208(f) is met, then the City must hold a full hearing under § 47–208(a) and "termination shall be automatically delayed until at least the date set."  Code of Ordinances § 47–208(a).

If termination is for immediate danger, then termination can take place immediately upon prior notice.  *See* Code of Ordinances § 47–208(f).  If termination is for a likelihood that the City will be in violation of its own permit, then termination can take place immediately after 10 days' prior notice.  *See id.* § 47–208(a), (f).  And if termination is for any other reason, including, for example, violations of the customer's own permit from the City, then termination can take place only after 10 days' notice and a pre-termination hearing.  *See id.* § 47–208(a).

9.     This reading of the City's ordinances is required by their text, but has the added virtue of making the ordinances match the EPA's Model Pretreatment Ordinance. *See* Ex. Q § 10.7.  Under the Model Ordinance:

[The Superintendent] may immediately suspend a User's discharge, after informal notice to the User, whenever such suspension is necessary to stop an actual or threatened discharge, which reasonably appears to present, or

cause an imminent or substantial endangerment to the health or welfare of persons."

*Id.* This section lines up with the "immediate danger" subsection of § 47–208(f): under both the Houston ordinance and the Model Ordinance, the only circumstance in which the City can terminate wastewater service immediately after notice is where there is "imminent or substantial endangerment to the health or welfare of persons."

10.     By contrast, if the termination is in response to a discharge "that threatens to interfere with the operation of the POTW, or which presents, or may present, an endangerment to the environment," the Model Ordinance provides for termination of service only "after notice and opportunity to respond." Ex. Q at § 10.7. This parallels the Houston ordinance, which requires 10 days' prior notice, but not a pre-termination hearing, for a termination of service on the ground of a "likelihood that the city's treatment plant permit parameters (including sludge) will be violated." Code of Ordinances § 47–208(a), (f)(2).

11.     Finally, for a termination that is based only on ordinary permit violations, the Model Ordinance requires an elaborate prior notice and hearing procedure. *See* Ex. Q at § 10.3. This parallels, although in a much more elaborate and hence protective form, the hearing procedure in the Houston ordinance for 10 days' notice and a pre-termination hearing. *See* Code of Ordinances § 47–208(a). The three increasing levels of procedural protection, and even the separation between "emergency shutdowns," which may be immediate after prior notice in the case of "imminent danger" or immediate after 10 days' notice in the case of risk to the City's own compliance with its permit, and ordinary shutdowns for violation of permit conditions, which require a pre-termination hearing, exist in both the Houston ordinance and the Model Ordinance.

6

12.    In the case at bar, the City did not give 10 days' notice of termination; it gave no notice at all.  Accordingly, the City's act could only have been lawful, even under its own ordinances, if there was "an immediate danger to the health of city employees or the public."   Code of Ordinances § 47–208(f).   Any other basis for terminating wastewater service would have required at least 10 days' notice.  *See* Code of Ordinances § 47–208(a).  By proceeding under the "immediate danger" section, the City denied CES any pre-termination notice or hearing at all.   Instead, CES got a post-termination hearing in front of a City employee at which the City expected CES to respond to a finding of immediate danger based on entirely unspecified evidence and reasons and in which CES received the official finding only at the hearing itself.

**C.    On Wednesday, November 4, 2009, the City held a hearing at which it defended Mr. Marcotte's findings of "immediate danger" in front of a Hearing Officer who was a non-lawyer city employee, who reports to Mr. Marcotte, and who was advised at the hearing by City Attorneys who, during the hearing, consulted with the City Attorneys arguing the City's case.**

13.    The hearing was like something out of Kafka.  *See* Ex. D (transcript).  The City summoned CES to appear to contest Mr. Marcotte's findings of immediate danger. But the City did not provide CES with a copy of those findings, with the reasoning underlying those findings, or with any information at all about the evidence, persons, or reports on which Mr. Marcotte relied in making his findings.  *See* Ex. D at 30:15–31:4 (City Attorney admitting that memorandum setting out Mr. Marcotte's findings was not turned over and that City failed to disclose witnesses on whom Mr. Marcotte purported to rely).  The City did not tell CES that, for example, a problem at the City's treatment plant had been traced to CES or that CES was discharging a chemical that might harm city

employees or the public.  (Neither is the case.)  CES came to the City Hall Annex to argue blind.

14.    CES received Mr. Marcotte's memorandum containing his finding of immediate danger at the hearing.  The memorandum states in full:

> I have been briefed by two of my deputy directors, Ms. Susan Bandy, Deputy Director of the Resource Management Division, and Mr. Jun Chang, Deputy Director of the Public Utility Division, concerning circumstances involving the pretreatment permit for CES Environmental Services, Inc., at its facility located at 4904 Griggs Road, Houston, Texas 77021
>
> **Based on the facts presented to me by Ms. Bandy and Mr. Chang**, and based on my professional engineering judgment, **I have determined that a discharge from CES causes an immediate danger to the health of city employees or the public** or a likelihood that the City's treatment plant parameters will be violated.  I have instructed my staff to proceed with immediately terminating wastewater service and to proceed with the processes under Article V of Chapter 47 of the Code of Ordinances for the City of Houston.  This includes providing CES with a hearing within three days of the notice of termination.

Ex. L.  The memorandum merely recites the statutory language without explaining at all what Mr. Marcotte's basis was for concluding "that a discharge from CES causes an immediate danger."  Moreover, Mr. Marcotte does not even conclude that there was an immediate danger; he says only that there was (1) an immediate danger **or** (2) a likelihood that the City's treatment plant parameters were violated.

15.    None of the witnesses who appeared in the documents were available for cross-examination at the hearing.  Mr. Marcotte was not available.  The assistant directors on whom Mr. Marcotte supposedly relied, Ms. Bandy and Mr. Chang, were not available.  Mr. Smith, the affiant whose affidavit the City read into the record, was not available.  It appears that the City chose as its representative to send to the hearing the only person involved who does not appear in the documents, Mr. Samarneh.  When CES demanded to

8

question these witnesses, the City replied that a continuance might be necessary and the witnesses might appear then — by which time, of course, CES's business would be dead. *See* Ex. D at 67:24–70:18. This denial of the fundamental right of cross-examination denied CES the ability to challenge the basis for the City's conclusions.

16.    Mr. Nassiri, the Hearing Officer who presided over the hearing, is Assistant Director of the Engineering and Construction Division of the Department of Public Works and Engineering. *See* Ex. D at 3:3–3:7. Because Mr. Marcotte is the Director of that Department, Mr. Nassiri ultimately reports to Mr. Marcotte, the man whose findings it was the hearing's purpose to review. When CES arrived at the hearing room, four City Attorneys were there: two to argue the case and two to advise Mr. Nassiri. The City Attorneys consulted with each other throughout the hearing. Several times, the City Attorneys advising Mr. Nassiri would confer with the City Attorneys presenting the City's case and whisper something inaudible to Mr. Nassiri, who would then announce an order. *See* Ex. D at 41:16–42:3.

17.    Here, it is necessary to understand something about CES's operations. CES operates a consolidated waste treatment facility that takes industrial wastewater; separates out oils, water, and solids; prepares the solids for disposal in an appropriate landfill; reclaims the oils as a salable product; and discharges the water into the City's sewers after treatment. *See* Ex. E, F, G (declarations of CES employees describing the process). This discharge is covered by Permit No. 9558 and enters the City's sewers through what is called Sample Point (5). *See* Ex. K (permit).

18.    CES also operates a tank- and drum-wash facility that cleans dirty tanks (the containers on tanker trucks) and drums (barrels used to store chemicals or

wastewater); takes wastewater from this cleaning operation to the consolidated waste treatment facility if further treatment is necessary; and otherwise discharges the wastewater into the City's sewers. *See* Ex. E (declarations of CES employee describing the process). This discharge is covered by Permit No. 6806 and enters the City's sewers through what is called Sample Point (1). *See* Ex. J (permit).

19.    Permit Nos. 9558 and 6806 are completely separate. Neither refers to the other. Neither is conditioned on compliance with the terms of the other. Each governs a separate operation.

20.    Before the shutdown on October 31, the City and CES had four ongoing disputes:

- The City wants CES to shut down Sample Point (1) and discharge everything through Sample Point (5) — a procedure that would require trucking wastewater across the Griggs Road facility or laying new pipe, both expensive propositions. *See* Ex. M.

- The City alleges that CES exceeded the categorical limits in its permit for copper, zinc, o-cresol, p-cresol, and trichlorophenol at Sample Point (5). *See* Ex. N.

- The City alleges that CES exceeded the total toxic organics discharge limit in its permit at Sample Point (5). *See* Ex. O.

- The City alleges that CES had a broken sampling point at Sample Point (5). *See* Ex. P. CES completed repairs on this sampling point on Wednesday, November 4.

At the hearing, the City's evidence consisted entirely of documents (letters, responses, etc.) showing the history of these four disputes. *See* Ex. D at 11:9–18:17.

21.    Even if one believes that the City is correct in each of these disputes, this shows only that CES violated certain conditions in its permits. But permit violations are not a basis for terminating service without 10 days' prior notice and a pre-termination hearing. *See* Code of Ordinances § 47–208(a), (f). The City completely failed to argue at

10

the hearing that any of these violations, even if true, created an "immediate danger to the health of city employees or the public." *See* Ex. D at 8–18 (entire City presentation containing no mention of "immediate danger").

> **D.    The City's only witness, Walid Z. Samarneh, testified that there was no imminent danger of harm to city employees or the public to justify the City's emergency termination of CES's wastewater service.**

22.    In fact, the City's own (and only) witness, Walid Z. Samarneh, admitted that he didn't know whether any of these violations created any immediate danger to the health of city employees or the public.  Mr. Samarneh testified that his "area of responsibility is the regulatory compliance for all the wastewater treatment plants" and that he also "oversee[s] the wastewater laboratory and the industrial pretreatment program" for the City of Houston. *See* Ex. D at 74:14–20.  Mr. Samarneh was completely unable to identify an immediate danger, to offer any evidence at all that CES caused that danger, or even to testify that any of the chemicals over which CES and the City had ongoing disputes could do any harm.

23.    The only "dangers" that Mr. Samarneh could come up with were "watery eyes or burning in the eyes" and "a chemical smell":

**Q.**    Are you aware of any discharge at CES that poses an eminent [sic] threat to human life or to the welfare of a City employee?

**A.**    I can tell you when an operator calls me and says, "My ammonia is going out the roof or peaking," and as those employees work around the plant, they experience watery eyes or burning in the eyes or you can smell that chemical smell.  So that's the feedback I get from operation folks.

**Q.**    Right.   These are employees at the Sims City [sic; should be Bayou] plant?

**A.**    Correct.

* * *

**Q.**    Do they have other symptoms besides watery eyes?

11

**A.**    Sometimes burning, sometimes the smell.  You can smell the difference between a wastewater treatment plant normally running and one that has a slug of pollutants coming in that's not supposed to be there.

**Q.**    So employees at the Sims plant have complained to you about watery eyes and a bad smell; is that correct?

**A.**    That's one of the symptoms we see when industrial waste come into the plant, yes.

**Q.**    Have they complained to you about any other symptoms besides a bad smell and runny eyes?

**A.**    Sometimes you cannot work around those conditions.

**Q.**    Sure.  **But the only complaints they've made are runny eyes and a bad smell; is that correct**?

**A.**    **Bad smell, correct.**

Ex. D at 63:12–64:25 (emphasis added).  "Runny eyes and a bad smell" at a sewage plant

is not the kind of "imminent danger" that justifies shutting down a business.

24.    Even if the City had identified an imminent danger in the form of the

burning eyes and the bad smell, however, Mr. Samarneh testified that the City could not

identify what chemicals caused these symptoms, much less establish that the chemicals

that caused these symptoms came from CES:

**Q.**    So you know that it's industrial waste that's causing the burning eyes and the bad smell, right?

**A.**    According to them, yes.

**Q.**    Yes, according to the —

**A.**    Operation staff.

**Q.**    Okay.  And do you know anything more specific than that?  **Do you know which industrial wastes would cause burning eyes or bad smell?**

**A.**    **No.**

**Q.**    Okay.  **And since you don't know which industrial waste, you certainly can't say that there are industrial waste coming from CES, can you?**

**A.**    <u>No.</u>  There is a service area that CES is contributor to.

**Q.**    Right.  So you know that it's industrial waste —

**A.**    So your client is contributing to whatever we have.

**Q.**    Sure.  The industrial waste is coming from a group of providers, not just CES?

**A.**    Correct.

Ex. D at 65:12–66:7 (emphasis added).  The City took no steps to identify the cause of its employees complaints about burning eyes or a bad smell and appears to have no evidence at all to link these symptoms to CES.

25.    Mr. Samarneh was unable to testify that any of the chemicals for which the City and previously issued Notices of Violation to CES could create imminent danger to the health of city employees or the public.  He went through the list one by one:

**Q.**    **Does copper in the plant cause burning of the eyes?**

**A.**    **I'm not sure.**

**Q.**    Does copper cause a bad odor?

**A.**    It depends on what form it comes in.  I'm not sure.

**Q.**    Does zinc cause burning of the eyes?

**A.**    Are you talking about the excessive violation of zinc in your permit?

**Q.**    Yeah, you cited us for —

**A.**    Yeah, because you're exceeding your permit.

**Q.**    Yeah.  **Does zinc, that you say we exceeded the permit by, does that cause bruning of the eyes?**

**A.**    **Well, I'm not an expert on that, so I cannot answer your question.**

**Q.**    **Does tricholorophenol cause burningof the eyes?  You don't know?**

**A.**    No.

**Q.**    No, it doesn't or, no, you don't know?

**A.**      **I don't know the answer.**

**Q.**      **Does o-cresol cause burning of the eyes?**

**A.**      **Again, I don't know the answer.**

**Q.**      Does p-cresol cause burning of the eyes?

**A.**      Are these the things cited in your effluent?

**Q.**      Yeah.  September 10 NOV.

**A.**      So these are these?

**Q.**      What's that?

**A.**      These are violations of your permit, correct?

**Q.**      No.  These are alleged violations of our permit.

**A.**      Okay.

**Q.**      **So does p-cresol cause burning of the eyes, do you know?**

**A.**      **I don't know the answer to that.**

**MR. CAMARA:**      So **the specific things they cited us for, their witness can't say whether those cause physical symptoms in any way**.  I've laid out my argument, so I'm done.  Thank you very much for your time, Mr. Samarneh.

**HEARING OFFICER:**      Cross-exam.

Ex. D at 71:25–73:16 (emphasis added).   There is simply no evidence of imminent danger at all.

        26.      The City cannot disclaim Mr. Samarneh's testimony.  CES told the City at the hearing that it intended to use Mr. Samarneh's testimony in subsequent litigation and invited the City to cross-examine Mr. Samarneh (even though he was the City's own witness) fully.  At the beginning of the examination of Mr. Samarneh, CES said:

**MR. CAMARA:**      I'd just like to have it on the record that I intend to use this testimony in court, so I don't want to impede your ability to cross-examine him.  So please feel free to do so.  And off we go.

14

Ex. D at 54:9–54:12. And the City introduced Mr. Samarneh as its representative who would answer "any questions." Ex. D at 8:13–8:16. His testimony constitutes admissions by the City.

27. The City exercised its right to cross-examine Mr. Samarneh. *See* Ex. D at 73:19–76:13. The City's questions were aimed at showing that Mr. Samarneh is "a professional engineer registered in the State of Texas" but not "a toxicologist," "trained in industrial hygiene," or "a medical professional." Ex. D at 73:19–74:3. That is, the City attempted to disqualify its own witness — the only witness that it brought to the hearing to prove its own case. Without Mr. Samarneh, there is no evidence of "imminent danger" at all; of course, even with Mr. Samarneh, there is no evidence of imminent danger, since Mr. Samarneh testified that no such danger existed.

**E.    The City's lawless termination of wastewater service is destroying CES's business.**

28. CES cannot operate without wastewater service. CES cannot treat incoming wastes because it cannot discharge the resulting wastewater. It cannot wash drums or tanks for the same reason. CES has had to rent additional fracture tanks to store incoming waste from customers until wastewater service is restored. CES can survive only until the middle of next week without wastewater service. Greg Bowman spells out the consequences for CES in his declaration:

> Closure of the plant, for more than a weekend, will cause an irreversible collapse of our financial condition and erode the confidence of remaining Customers and Employees resulting in an exodus of both that cannot be sustained or repaired.

> If the sewer discharge is re-opened quickly, the Company can continue the ongoing recovery from the incredible series of negative events we have sustained over the past 12 months. The current precarious state of the company notwithstanding, the long-term survival and success of the company remains positive. Despite the intense scrutiny of numerous

15

> agencies and unfavorable news coverage, current and prospective
> customers are always favorably impressed when auditing our company
> due to the range of our capability and the cleanliness and upkeep of our
> facility.

Ex. R.  The City effectively sentenced CES to corporate death when it terminated

wastewater service without notice or a pre-termination hearing.  Even if CES ultimately

preserves in damages litigation against the City, it will be impossible to restore CES's

business.

29.    CES operates in a highly regulated industry and has been the subject of

multiple regulatory investigations.  These investigations resulted from a kind of perfect

storm.  Within the past year, there have been three unfortunate but accidental employee

deaths.  One was at the Griggs Road facility; two were at a Port Arthur facility owned by

CES affiliate Port Arthur Chemical & Environmental Services, Inc. (PACES).

Additionally, a former City Attorney has filed a nuisance and toxic tort class action

against CES on behalf of 117 individual named plaintiffs and against CES and 40

additional defendants.  This case is currently pending in the 61st Civil District Court in

Harris County.  The plaintiffs in this class action, many of them CES neighbors, have

called in incessant air quality complaints since filing their suit.

30.    All CES's regulators other than the City of Houston have been willing to

work with CES.  The Texas Attorney General filed, at the request of the Texas

Commission on Environmental Quality, a civil enforcement action against CES in

Austin.  But the Attorney General's Office had set up a meeting with CES even before

filing its suit to discuss an agreed resolution.  Although the suit pleads a request for a

preliminary injunction, the Attorney General's Office has stated that it does not intend to

seek such an injunction until at least January, by which time the parties may have

negotiated an agreed resolution.  The same is true at the federal level with OSHA, where OSHA regulators have been more than happy to meet with CES and discuss potential changes to CES's operations that would give the regulators greater confidence.

31.    CES is not the only party injured by the City's lawless action.  CES's customers rely on CES to accept hazardous and non-hazardous waste shipments regularly.  There are very few competitors with CES's capabilities in the Houston area. All of these competitors are full.  If CES cannot accept shipments, its customers will have to halt their own industrial processes, at least until they can make arrangements to ship their waste elsewhere.  *See* Ex. H (Declaration of Mark Atkins, CES customer).

32.    CES is continuing to accept these shipments and has rented additional storage to hold waste until the City restores CES's wastewater service.  If CES is forced to close, CES or its customers (or the state or federal cleanup funds) will have to make arrangements to deal with this waste.  If CES had received notice and a pre-termination hearing, then CES and its customers could have made arrangements for the orderly shutdown or temporary halt of CES's business.  The surprise nature of the City's shutdown has made this impossible.  The City has taken a perfectly safe situation and created a potentially hazardous one, all because it acted in violation of its own ordinances and the basic rules of due process codified in the Constitution.

33.    CES respectfully prays to this Court for relief.  It has no other choice.

## II.    PARTIES

34.    Plaintiff CES Environmental Services Inc. is a Texas corporation with its principal place of business at 4904 Griggs Road, Houston, Texas.  CES operates a waste treatment center that processes hazardous and non-hazardous oil, organic, and metallic wastewater, reclaims salable oil products, and safely disposes of solid wastes.  CES may

be served by serving its counsel of record, Camara & Sibley LLP (attn: K.A.D. Camara), 2339 University Boulevard, Houston, Texas 77005.

35.     Defendant The City of Houston is a municipal corporation chartered by the State of Texas. It "may sue and be sued." Charter of the City of Houston, art. II § 1. The City of Houston may be served by serving its "mayor, clerk, secretary, or treasurer." Tex. Civ. Prac. & Rem. Code § 17.024(b) (state rule for serving a city); *see* Rule 4(j)(2) ("A . . . municipal corporation . . . that is subject to suit must be served by: (A) delivering a copy of the summons and of the complaint to its chief executive officer; or (B) serving a copy of each in the manner prescribed by that state's law for serving a summons or like process on such a defendant."). The Mayor may be served at City Hall, 901 Bagby Street, Houston, Texas 77002.

36.     Defendant Michael S. Marcotte is the director of the Department of Public Works and Engineering, City of Houston. Mr. Marcotte made the determination on which the City of Houston relied in terminating CES's wastewater service. Wastewater services are among the responsibilities of his department. CES names Mr. Marcotte as a defendant in his official capacity only. Mr. Marcotte may be served at the Department of Public Works and Engineering, 611 Walker Street, Houston, Texas 77002.

## III.    JURISDICTION AND VENUE

37.     Subject-matter jurisdiction exists under 28 U.S.C. § 1331 (federal question) because this suit arises under federal law (42 U.S.C. § 1983) and the United States Constitution.

38.     General jurisdiction exists over the City of Houston because, being a municipality located entirely within this State and judicial district, its headquarters and principal place of business are both located within this State and judicial district. General

jurisdiction exists over Mr. Marcotte because he is an officer of the City of Houston and has his principal place of business and all his business activities within this State and judicial district.

39.    The City of Houston does not enjoy sovereign immunity from suit in federal court. *See, e.g., Northern Ins. Co. of New York v. Chatham County, Georgia*, 547 U.S. 189, 196 (2006) (recognizing "general principle that sovereign immunity does not bar a suit against a city"); *Jinks v. Richland County, South Carolina*, 538 U.S. 456, 466 (2003) ("municipalities, unlike States, do not enjoy a constitutionally protected immunity from suit"); *Fuesting v. Lafayette Parish Bayou Vermillion Dist.*, 470 F.3d 576, 579 (5th Cir. 2006).

## IV.    THE CITY REFUSED TO HEAR CES'S DUE PROCESS CLAIM AT THE ADMINISTRATIVE HEARING, SO THERE IS NO ONGOING STATE PROCEEDING IN WHICH CES CAN RAISE ITS CONSTITUTIONAL ARGUMENTS.

40.    CES was not permitted to raise its constitutional due process claim at the City of Houston's administrative hearing.  Accordingly, there is no ongoing state or municipal proceeding in which CES can raise its constitutional claim.  CES attempted to raise procedural due process objections at the beginning of the hearing and throughout its presentation.  In particular, CES objected:

- to the lack of notice, *see* Ex. D at 19:19–21:17;

- to the lack of a pre-termination hearing, *see* Ex. D at 19:19–21:17;

- to the City's failure to disclose the basis for Mr. Marcotte's findings, *see* Ex. D at 19:7–27:16, 31:14–32:6;

- to the City's failure to disclose the memorandum containing Mr. Marcotte's findings until the hearing itself, *see* Ex. D at 19:7–27:16, 30:16–31:1, 31:14–32:6;

- to the City's failure to disclose the witnesses on whom Mr. Marcotte relied in making his findings, *see* Ex. D at 24:9–27:2, 28:21–29:4, 31:1–31:4, 31:14–32:6;

19

- to the City's refusal to allow CES to call other City employees who had relevant information and, thereby, to the City's refusal to allow CES to cross-examine the witnesses against it, *see* Ex. D at 24:9–27:2;

- to the fact that Mr. Nassiri was not an objective and independent judge because he was a City employee who reports ultimately to Mr. Marcotte, *see* Ex. D at 41:16–42:3;

- to the fact that Mr. Nassiri was being advised by City Attorneys who repeatedly consulted with the City Attorneys who were presenting the City's case, *see* Ex. D at 41:16–42:3; and

- to other defects in the hearing procedure.

    For example, CES argued:

    **We intend to present procedural objections to this hearing. We believe that it's unconstitutional** under 42 United States Code, Section 1983, which is why I wanted to ask you whether that defense would be within the scope of this hearing or not. But I can elaborate on that now or when we have the opportunity.

Ex. D at 7:11–7:17 (emphasis added).

41.    Again, specifically on the due-process right to prior notice and a pre-

termination hearing:

    So **we think and would submit that the City** has violated not only municipal ordinances in trying to shut us down, but **has denied us a constitutional right known as procedural due process.**

    **That right says that when the government**, whether the federal government, state government or a municipal government, **takes away a right, like our permit right, it's got to give us prior notice and a hearing** so that we can offer evidence that we haven't, in fact, violated those permits. If the government acts without offering such prior notice or a hearing, then it's violated our right under the 14th Amendment of the United States Constitution. . . .

    [T]hat right has been explicated in a long series of decisions by the United States Supreme Court and the Court of Appeals for the Fifth Circuit, which is the court of appeals that has jurisdiction over states, including Texas.

    **Those cases — Goldberg versus Kelly, Fuentes versus Shevin, the list goes on and on — say that only in the starkest emergency**

**circumstances can a state or a municipal government deprive a party, like CES, of a right without prior notice and a hearing.**

So how can they do it?  They can do it if they give us notice and a hearing.  And what kind of notice and hearing, that's a close question.  That's for judges to decide depending on the importance of the right, the size of the threat, and the quality of the evidence.  So it may be that ten days notice and a hearing like this would suffice or it may not be.

But **what is perfectly clear under the cases and the Constitution is that no notice and no hearing at all do not satisfy those procedural due process standards.**

Ex. D at 21:5–22:22 (emphasis added).

42.     Again, specifically on the due-process right to see the evidence against

you and to test that evidence by cross-examination of witnesses:

**Let me also explain another right the City has violated is the right to engage in cross-examination of witnesses.**  And cross-examination is where I get to see who it is they're relying on to prove their case and cross-examine them, and that is the foundation of the American system of getting things out through adversary hearings like this.

So let's see who they relied on.  Because Mr. Samarneh is here to answer questions and I appreciate your being here and I will ask you some questions.  But Mr. Samarneh is not the person they're relying on.

The first person they're relying on is Mr. Marcotte, who is the director of the Public Works and Engineering Department to the City of Houston.  And as I was explaining to you, Section 47-208(f) is triggered only when Mr. Marcotte certifies that there's that risk of eminent harm.  And I don't know what exhibit this is.  Do you?  The memorandum.

**MS. PRICE:**  It is 15. [attached as Ex. L]

**MR. CAMARA:**  So Exhibit 15 which they gave you is a memorandum from Mr. Marcotte that purports to make that finding.  But if you look at it, it doesn't say that Mr. Marcotte himself is engaged in the investigation.  It says that **he's relied on a briefing by Ms. Susan Bandy, deputy director of the resource management division, and Mr. Jun Chang, deputy director of the public utility division, neither of whom is here.**

So **I cannot hear from them about what the evidence was that they took to Mr. Marcotte to get him to issue this certification.  I can't ask them about where they got that evidence.  I can't ask them about what questions Mr. Marcotte asked.**

21

In other words, I have no way of exploring at this hearing whether these findings were justified or whether, as I think is quite possibly the case, Mr. Marcotte was presented with a letter and signed.  **I have no way of doing that because of their denial of our right to cross-examination and our right to see the basis of the findings.**

Secondly, if you look at the letter, it doesn't say why Mr. Marcotte thinks that there's an immediate danger to the physical health of a City employee or of a member of the public, and he doesn't say why the City's permit parameters be violated.

That is, it just takes the text of a statute, rewords it a little and regurgitates it in the letter.  It's the kind of form denial that you get from your cell phone company when they're fighting with you about a bill or you get from a bank.  But it gives you no idea what's actually going through Mr. Marcotte's mind, if anything is going through it, and it gives us no idea of what the basis is for those conclusions.

For example, if Mr. Marcotte had said that CES had been caught releasing a certain chemical and that chemical might have caused harm to people, and that was the basis for his determine, if he had told us that we could have come here with an expert chemist to tell you either, no, we're not discharging that chemical or, no, when that chemical is discharged it doesn't have those effects, or whatever our response would be.

But because Mr. Marcotte has fully failed to state the basis for his findings, we have no way of doing that.  So **we come here, we get the evidence today, we see the memo for the first time, we cannot question the people who are listed in it or Mr. Marcotte, who supposedly heard them**.  And even the memorandum itself, even if you belief it, does not explain the basis for making the necessary emergency findings under 47-208(f).

Next, the affidavit —

**MS. PRICE:**  I would like to interject at this point that Mr. Marcotte is available — or shall we say would have been available had we started on time, but he has a meeting that began at 3:00 o'clock with the mayor.  But if you want to ask him questions he will make himself available.

**MR. CAMARA:**  I would like to.  **I would like on the record actually to request to question today Ms. Susan Bandy, Mr. Jun Chang, Mr. Michael Marcotte, Mr. Clyde Smith, and anyone else on whom Susan Bandy, Jun Chang, Michael Marcotte have relied on in making this determination.  I believe that's my client's constitutional right.**

22

Ex. D at 24:9–27:16 (emphasis added).   Contrary to Ms. Price's suggestion in this passage, Mr. Marcotte never appeared at the hearing despite repeated requests.   CES was told that he was "closeted with the Mayor."

43.    At the instigation of the City Attorneys, Mr. Nassiri held that CES could not raise these procedural due process objections at the hearing and that CES should instead raise them "in federal court."   Here is the relevant passage:

> **MS. PRICE:**   Well, **Mr. Camara, I know that you're making an extremely persuasive argument on the constitutional basis** —
>
> **MR. CAMARA:**  Thank you.
>
> **MS. PRICE:**   — of the rights that you believe that are owed to your client.  But the scope of this hearing, as I think our hearing officer stated, is the termination of service.
>
> **MR. CAMARA:**  Yes.  And I'm arguing —
>
> **MS. PRICE:**   And **your constitutional claims are more properly brought either in federal court** or in state court.   This is an informal administrative hearing.
>
> **MR. CAMARA:**  I'll be happy to do that if you prefer.   **Would that be the appropriate procedure?**
>
> **HEARING OFFICER:  I believe so.**

Ex. D at 27:17–28:9 (emphasis added).   The City of Houston invited CES to raise its constitutional claims in this Court rather than at the administrative hearing.

## V.    CAUSE OF ACTION — 42 U.S.C. § 1983

### A.    Elements

44.    Section 1983 creates a federal cause of action against anyone who deprives a person of his constitutional rights while acting under color of State or municipal law.  In relevant part, § 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia,

subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.

45.    Corporations have standing to sue as plaintiffs under § 1983.  *See RK Ventures, Inc. v. City of Seattle*, 307 F.3d 1045, 1057 n.7 (9th Cir. 2002); *Des Vergnes v. Seekonk Water Dist.*, 601 F.2d 9 (1st Cir. 1979) ("It does not matter that Heritage is not an individual.  Corporations are persons whose rights are protected by 42 U.S.C. § 1983.") (collecting cases).

46.    The elements of a § 1983 claim are "(1) a deprivation of a right secured by federal law (2) that occurred under color of state law and (3) was caused by a state actor." *Victoria W. v. Larpenter*, 369 F.3d 475, 482 (5th Cir. 2004).  "Section 1983 imposes liability for violations of rights protected by the Constitution." *Id.*

47.    "To bring a procedural due process claim under § 1983, a plaintiff must first identify a protected life, liberty or property interest and then prove that governmental action resulted in a deprivation of that interest." *Baldwin v. Daniels*, 250 F.3d 943, 946 (5th Cir. 2001).

**B.     CES had a property interest in its right to discharge wastewater under its permits from and contract with the City of Houston.**

48.    CES has two permits from the City of Houston that give it the right to discharge wastewater into the City's sewers.  *See* Ex. J, K.  This right is a property right protected by due process.  The property protected by the Due Process clause includes "any significant property interest, including statutory entitlements." *Fuentes v. Shevin*, 407 U.S. 67, 86 (1972).  Any "legitimate claim of entitlement . . . deriving from a state or

24

federal statute, municipal ordinance or charter, [or] an express or implied contract"
constitutes a protected property interest.  *North Central Texas College v. Ledbetter*, 566
F. Supp. 2d 547, 550 (E.D. Tex. 2006).

49.     CES's right to discharge wastewater into the City's sewers is guaranteed
by the City of Houston's Code of Ordinances, pursuant to which CES applied for and
obtained its permits.  These permits give CES the right to discharge wastewater until they
expire or are properly modified or terminated.  The City has the right to modify or
terminate these permits under its Code of Ordinances, but only for certain specified
reasons and after following certain specified procedures.  *See* Code of Ordinances §§ 47–
189(b), 47–190.  Once the City granted CES its permits, it granted CES a property
interest that it could remove only with due process of law.

50.     Courts have unanimously held that the rights secured by government
permits qualify for protection as property under the Fourteenth Amendment.  *See, e.g.,*
*Woodwind Estates, Ltd. v. Gretkoski*, 205 F.3d 118, 123 (3d Cir. 2000) ("the holder of a
land use permit has a property interest"); *Bituminous Materials, Inc. v. Rice County,*
*Minnesota*, 126 F.3d 1068, 1070 (8th Cir. 1997) (same); *Independent Enterprises, Inc. v.*
*Pittsburgh Water & Sewer Authority*, 103 F.3d 1165, 1179 n.12 (3d Cir. 2000) ("all of
these cases involve zoning decisions, building permits, or other governmental permission
required for some intended use of land owned by the plaintiffs").  Once a permit is
granted, the Government may take it away only with due process of law.

51.     Time and again the courts have found protected interests in continuation
of utility service once the Government has begun to provide that service.  *See, e.g., Koger*
*v. Guarino*, 412 F. Supp. 1375, 1386 (E.D. Pa. 1976), aff'd 549 F.2d 795 (3d Cir. 1977);

*Craft v. Memphis Light, Gas & Water Div.*, 534 F.2d 684, 687 (6th Cir. 1976); *Palmer v. Columbia Gas of Ohio, Inc.*, 479 F.3d 153, 156 (6th Cir. 1973); *Condosta v. Vermont Elec. Corp., Inc.*, 400 F. Supp. 358, 365 (D. Vt. 1975); *Donnelly v. City of Eureka*, 399 F. Supp. 64, 67 (D. Kan. 1975); *Limuel v. Southern Union Gas Co.*, 378 F. Supp. 964, 065 (W.D. Tex. 1974); *Bronson v. Consolidated Edison Co. of New York*, 350 F. Supp. 443, 447 (S.D. N.Y. 1972); *Hattell v. Public Service Co. of Colorado*, 350 F. Supp. 240 (D. Colo. 1972); *Stanford v. Gas Service Co.*, 346 F. Supp. 717, 719 (D. Kan. 1972).

      **C.**    **The City deprived CES of its right to discharge wastewater without due process of law.**

      52.    Because CES has a property interest in its right, under its City permits, to discharge wastewater, the City can lawfully terminate CES's wastewater service only after affording CES due process of law.  Due process of law requires some kind of pre-termination hearing at which CES would have the opportunity to contest the City's rationale for shutting down wastewater service.  This is a right as old as the Republic. *See Fuentes v. Shevin*, 407 U.S. 67, 80–82 (1972) (seminal case) (long discussion at cited pages worth reading in full); *Goldberg v. Kelly*, 397 U.S. 254, 264–65 (1970); *Mathews v. Eldridge*, 424 U.S. 319, 333–35 (1976) (collecting cases).  There may be room for argument about what kind of hearing is constitutionally required.  But there can be no doubt that a hearing of some kind, and notice of that hearing, is required.

      53.    The prejudice to CES resulting from denial of its constitutional right to a pre-termination hearing is great.  Even a cursory review of the transcript of the post-deprivation administrative hearing reveals that the City had no basis whatsoever for concluding that an imminent danger to health existed that would entitle it to shutdown wastewater service.  Despite the admission of the City's only witness to this effect and

the complete lack of any other evidence of imminent danger, the City has still failed to restore wastewater service. This is precisely the kind of arbitrary deprivation of vested rights that procedural due process is meant to prevent. *See Carey v. Piphus*, 435 U.S. 247, 259–60.

54. The Supreme Court has held that due process for termination of utility service requires a pre-termination hearing precisely because it shuts down the affected facility entirely:

> Under the balancing approach outlined in *Mathews*, some administrative procedure for entertaining customer complaints prior to termination is required to afford reasonable assurance against erroneous or arbitrary withholding of essential services. The customer's interest is self-evident. Utility service is a necessity of modern life; indeed, the discontinuance of water or heating for even short periods of time may threaten health and safety.

*Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 18 (1978). Although *Memphis Light* involved consumer utilities, the safety problem is only magnified in the context of essential utilities to an industrial wastewater treatment plant like CES's.

55. The denial of any kind of pre-termination hearing at all is itself a complete violation of due process that can serve as the basis for a TRO requiring the City to restore wastewater service. The City's post-deprivation hearing was, itself, however, also a denial of procedural due process. That hearing, described in detail above, denied CES procedural due process in at least the following respects:

- the City's failure to disclose the basis for Mr. Marcotte's findings;

- the City's failure to disclose a copy of the memorandum containing Mr. Marcotte's findings until the post-deprivation hearing;

- the City's failure to disclose the witnesses on whom Mr. Marcotte supposedly relied to arrive at his findings;

- the City's refusal to allow CES to call other City employees who had relevant information and, thereby, to the City's refusal to allow CES to cross-examine the witnesses against it;

- the Hearing Officer, Mr. Nassiri, was not an objective and independent judge because he was a City employee who reports ultimately to Mr. Marcotte;

- the Hearing Officer, Mr. Nassiri was being advised by City Attorneys who repeatedly consulted with the City Attorneys who were presenting the City's case; and

- to other defects in the hearing procedure.

The violations of due process over which CES is suing are these as well as that there was no notice of the termination until it happened and that there was no pre-termination hearing at all.

56.     The fundamental flaw with the post-termination hearing was its orchestrated character.  The City came in to present its own undisclosed evidence, with its secret witnesses out of the range of cross examination, before a judge in its employ advised by the same lawyers arguing the case on its behalf.  This kind of proceeding is the sort of thing the common law has stood against for centuries.  *Nemo iudex in sua causa*.  *See, e.g.., Dyer v. Calderon*, 151 F.3d 970, 984 (9th Cir. 1998) ("In the common law, implied bias can be traced all the way back to Sir Edward Coke's dictum in *Bonham's Case* that no man shall be judge in his own cause.  *See Dr. Boham's Case*, 77 Eng. Rep. 646, 652 (C.P. 1610)."); *Utica Packing Co. v. Block*, 781 F.2d 71, 77 (6th Cir. 1986) ("Anglo-American law does not permit anyone to be the judge of his own case. AT least since Lord Coke . . . this has been the rule.").

**D.     The defendants are state actors who acted under color of municipal law in denying CES due process of law.**

57.     Municipal corporations are "persons" who can be defendants under § 1983.  *See Monell v. Dep't of Social Services of the City of New York*, 436 U.S. 658, 701

(1978); *Zaragoza v. City of San Antonio, Texas*, 464 F. Supp. 1163, 1163–64 (W.D. Tex.

1979). Municipal corporations are liable under § 1983 for adopting, implementing, or

executing, through duly appointed officers, ordinances or official decisions that have an

unconstitutional effect:

> Local governing bodies, therefore, can be sued directly under § 1983 for
> monetary, declaratory, or injunctive relief where, as here, the action that is
> alleged to be unconstitutional implements or executes a policy statement,
> ordinance, regulation, or decision officially adopted and promulgated by
> that body's officers.

*Monell*, 436 U.S. at 690.

58. Municipal corporations are liable the official acts of their executive

decision-makers:

> A local governmental unit does not receive the qualified immunity that
> shields Sheriff Hamp. . . . Instead, **municipal liability under section 1983
> requires proof of three elements: (1) a policymaker; (2) an official
> policy; and (3) violation of constitutional rights whose moving force is
> the policy or custom.**
>
> The concept of "policy" in this standard is broader than laws or actions
> that have been given formal approval through an entity's policymaking
> channels. When the person who committed the challenged act is in charge
> of policymaking in that part of the government, "policy" can sometimes be
> found to have been established by the very act itself. The act must be a
> final decisionmaker who also is the policymaker, unconstrained by
> policies imposed from a higher authority.

*Hampton Co. Nat'l Surety, LLC v. Tunica County, Mississippi*, 543 F.3d 221, 226–27

(5th Cir. 2008) (emphasis added) (internal quotation marks and citations omitted);

*Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) (elements); *Woodard v.

Andrus*, 419 F.3d 348, 352–53 (5th Cir. 2005) (clerk of court who set filing fees pursuant

to statute was, in that capacity, executive decision-maker who could trigger municipal

liability).

29

59.    The City of Houston terminated CES's wastewater service without first holding a pre-termination hearing. Then, after terminating service, the City subjected CES to a post-termination hearing that lacked the fundamental features of a fair process: there was no neutral judge; the City withheld its allegations and evidence until the hearing; and the key witnesses were unavailable, so that it was impossible to cross examine them. The City did this upon the decision of a policymaker, Mr. Marcotte, and pursuant to its official policy, laid down in ordinances, as interpreted by the responsible agency, the Wastewater Division, and the Office of the City Attorney. This makes the City of Houston a proper defendant.

60.    Mr. Marcotte is also a proper defendant because he was a policymaker with respect to the decision to terminate CES's wastewater service because the ordinances committed the decision to terminate service without a prior hearing to him. *See* Ex. L; Code of Ordinances § 47–208(f); *Grove v. City of York, Pennsylvania*, 2007 WL 465568 at *7–*8 (M.D. Pa. 2007) (director of public works held to be policymaker for decision entrusted to him). Mr. Marcotte not only made the findings that the City relies on, he also expressly ordered the immediate termination of CES's wastewater service. *See* Ex. L. It is because of Mr. Marcotte's personal actions that the City terminated CES's wastewater service.

## VI.    TEMPORARY RESTRAINING ORDER

61.    The purpose of a temporary restraining order is to "preserve[e] the status quo and prevent[] irreparable harm just so long as is necessary to hold a hearing, and no longer." *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers,* 415 U.S. 423, 439 (1974). A plaintiff seeking such injunctive relief must demonstrate: (1) there is a substantial likelihood that he or she will prevail on the merits; (2) there is a substantial

30

threat that irreparable harm will result if the injunction is not granted; (3) the threatened injury outweighs the threatened harm to the defendant; and (4) granting a preliminary injunction will not disserve the public interest. *Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987) (citing *Canal Auth. of State of Florida v. Callaway*, 489 F. 2d 567 (5th Cir. 1974)); *see also Mississippi Power & Light Co. v. United Gas Pipeline Co.*, 760 F.2d 618, 621 (5th Cir. 1985).

62.    There is a substantial likelihood that CES will prevail on the merits.  As the cases cited above demonstrate, it is clearly established that a municipal government cannot deprive a permit holder of rights under the permit without due process of law. And it is also clearly established that due process of law requires at least some pre-termination proceeding.  Moreover, even setting aside the complete lack of a pre-termination hearing, the post-termination hearing that the City provided lacks even the most basic elements of fairness: the judge was a City employee who reports ultimately to Mr. Marcotte; the basis for Mr. Marcotte's findings (and even the findings themselves) were kept from CES until CES arrived at the hearing; and the City refused to make key witnesses available for cross examination.

63.    There is a certainty of irreparable harm if this TRO is not granted.  CES cannot operate without wastewater service.  But deliveries of hazardous and non-hazardous waste continue to arrive.  CES must have wastewater service so that it can safely process, treat, and discharge this waste.  The City's rash action has created a potentially unsafe situation where none existed before.  Moreover, if CES is prevented from operating, the only responsible thing will be for CES to arrange for transport of its waste to other facilities and to inform customers that CES is unable to process their waste

31

for the time being.  This will cost CES customers that it will not be able to regain.  And, with no revenue, CES will have to terminate more than forty employees, many of whom have very specialized skills and cannot be replaced.  It will be the end of a business.

64.    The public interest will be served by a TRO.  CES's customers, including some of the most famous companies in Houston like Kinder Morgan and Anheuser-Busch, rely on CES to treat their wastewater.  There are very few facilities in the Houston area that provide similar services.   All these facilities are full or near full.   CES's customers will have to transport their waste to remote facilities for treatment or halt their own industrial processes altogether while they make other arrangements for waste treatment.  Because there are so few waste treatment plants like CES, shutting down CES closes up an already narrow bottleneck in the industrial process.  It would better serve the public interest to grant the TRO and adjudicate the underlying issues (on which CES expects to prevail) on an expedited basis in this Court, with CES operating in the meantime.

65.    Moreover, as the City's own witness admitted, there is no evidence whatsoever to show that anything that CES is doing poses an imminent danger to the health of any city employee or any member of the public or poses a likelihood of interfering with the City's downstream treatment plants.   CES is in the process of working with an outside expert to prepare a report for this Court confirming what the City's witness has already admitted.  CES hopes to file this expert report with its motion for a TRO or as a supplement to that motion.  There simply is no environmental risk posed by allowing CES to operate.  If the City had any evidence to the contrary, one would have hoped that the City would have shown that evidence to CES or to the hearing

officer at the post-deprivation hearing.  But the City has proffered no such evidence.  The reasonable inference is that none exists.  In that situation, the public interest is clearly in getting CES back in operation.

## VII.    PRAYER FOR RELIEF

66.    CES demands trial by jury on all issues.

67.    CES respectfully requests:

1.    Compensatory damages for the harm caused by the City's shutdown, including but not limited to lost business and the cost of extra storage for accumulated wastes;

2.    Compensatory damages for the harm to CES's business reputation with both business partners and other regulators such as the TCEQ and the EPA;

3.    Punitive or exemplary damages to the maximum extent permitted by law;

4.    A temporary restraining order forbidding the City from further interfering with CES's wastewater service and requiring the City to immediately reconnect service to Sample Point (5);

5.    A preliminary injunction forbidding the City from further interfering with CES's wastewater service;

6.    A permanent injunction forbidding the City from further interfering with CES's wastewater service;

7.    Attorneys' fees, expert costs, and costs of court to the fullest extent permitted by law;

8.    Pre-judgment and post-judgment interest; and

9.    All other relief to which CES may be entitled in equity or at law.

DATED: November 5, 2009

Respectfully submitted,

/s/ K.A.D. Camara
K.A.D. Camara
Texas Bar No. 24062646
Southern District Bar No. 870498
camara@camarasibley.com

*Attorney-in-Charge for the Plaintiff*

Joe Sibley
Texas Bar No. 24047203
sibley@camarasibley.com
Kent Radford
Texas Bar No. 24027640
radford@camarasibley.com

Camara & Sibley LLP
2339 University Boulevard
Houston, Texas  77005
713-893-7973
713-583-1131 (fax)

*Attorneys for the Plaintiff*